INVENTION MARKETING
INCORPORATED,
Appellant,

v.

Warren SPANNAUS, Attorney General
for the State of Minnesota,
Respondent.

No. 48719.

Supreme Court of Minnesota.

May 11, 1979.

Messerli, Roe, Balogh & Kramer, William F. Messerli, Mark S. Larson, and David R. Kracum, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., and Jean E. Heilman, Spec. Asst., St. Paul, for respondent.

WAHL, Justice.

Invention Marketing, Inc. (IMI), a Minnesota corporation which offers services in the field of invention evaluation and marketing, appeals from an order of the Hennepin County District Court declaring the Invention Services Act, Minn.St. 325A.01–325A.10, constitutional. In an action for declaratory judgment and injunctive relief, the district court held the Act constitutional but continued a temporary injunction against its enforcement pending this appeal. We affirm.

In 1977, the Minnesota Legislature enacted the Invention Services Act (Act).[1] The Act has four basic features. First, it requires invention developers to make written disclosures to the customer that explain the contractual relationship between the developer and the customer and set forth data reflecting the average costs of the services and the extent to which the developer's past performance has been successful. Second, the Act requires the developer to post a surety bond equal to the greater of 10 percent of its gross income, based on the preceding year, or $25,000. Third, the Act provides the customer with an unconditional right to cancel his contract within three business days. Fourth, the Act creates certain remedies for the customer, such as the right to void a contract violative of the Act and a private cause of action for damages, and it authorizes the Attorney General to enforce the Act, using the provisions of the Consumer Fraud Act, Minn.St. 325.907.

The Act was passed following an investigation by the Minnesota Attorney General into numerous consumer complaints relating to invention marketing companies that were operating in Minnesota. These complaints alleged that the companies falsely promised to deliver marketing success and profit and that services for which the companies were paid were not performed. This and other information acquired through the investigation was provided to the Minnesota Legislature with the explanation that the injunctive relief provided in existing consumer laws was inadequate because insolvency or termination of operations by developers often prevented recovery by the injured consumers.

Although no complaints against plaintiff were filed with the Attorney General, the business practices and procedures employed by plaintiff which are subject to regulation by the Act are typical of the invention services industry. Sixty percent of the customers who consult plaintiff enter into an evaluation agreement for which the customer pays $350. The evaluation results in plaintiff's recommendation that the idea ei-

1. *Legislation specifically regulating the invention services industry has also been enacted in California, Invention Development Services Act, Cal.Bus. & Prof.Code §§ 22370–22394 (West), and in Virginia, Regulation of Invention* Development Services, Va.Code §§ 59.1–208—.1–215. The Florida Invention Services Act, Fla.Stat. § 501.136, was declared unconstitutional in *Shevin v. International Inventors, Inc.*, 353 So.2d 89 (Fla.1977).

ther be pursued or abandoned. One-half of plaintiff's customers proceed from the evaluation agreement into a marketing representation agreement which costs the customer between $1,400 and $2,000, or occasionally more, in fees. The normal fee for the representation contract paid by Minnesota customers is $1,600. The customer is not informed of the potential cost of the representation contract when he discusses the evaluation contract with plaintiff. Approximately 200 Minnesotans have entered representation contracts with plaintiff. These and other business practices in which plaintiff is engaged are significantly affected by the regulatory provisions of the Act.

This appeal raises three constitutional issues: (1) whether the Act denies plaintiff due process of the law; (2) whether the Act is unconstitutionally vague and ambiguous; and (3) whether the Act denies plaintiff equal protection of the law.

1. Due Process.

■ Plaintiff, while conceding that the Act serves to promote a public purpose, argues that the means used to reach that objective are so unreasonable that, in effect, its future operation will be prohibited. The means to a permissible legislative objective must be reasonable. *Hylen v. Owens*, 312 Minn. 309, 251 N.W.2d 858 (1977). The standard of review applicable to this case is set forth in *Federal Distillers, Inc. v. State*, 304 Minn. 28, 45, 229 N.W.2d 144, 157 (1975), appeal dismissed sub nom. *Griggs, Cooper & Co., Inc. v. Novak*, 423 U.S. 908, 96 S.Ct. 209, 210, 46 L.Ed.2d 137 (1975):

"In the field of economic regulation, without burdening this opinion by a historical recital of the changing attitude of the nation's courts, it is settled that the legislature is free to adopt whatever economic policy it deems will promote the public good. Where an economic regulation is enacted, the guarantee of due process demands only (1) that the act serve to promote a public purpose; (2) that it not be an unreasonable, arbitrary, or capricious interference; and (3) that the means chosen bear a rational relation to the public purpose sought to be served."

With these standards in mind, we address the specific provisions which plaintiff contends are unreasonable.

■ Plaintiff claims the so-called success ratio is an impossible burden. The success ratio must be disclosed to the customer either in the first written communication from the invention developer or at the first meeting between the customer and the developer, § 325A.05, subds. 1 and 3, and must be included in the contract for services, § 325A.04, subd. 6.

The success ratio is defined as follows:
" * * * the total number of customers who have contracted with the invention developer, except that the number need not reflect those customers who have contracted within the last 30 days, and (2) the number of customers who have received, by virtue of the invention developer's performance of invention development services, an amount of money in excess of the amount of money paid by such customers to the invention developer pursuant to a contract for invention development services." Minn.St. 325A.04, subd. 6; 325A.05, subd. 3.

An identical provision in the Florida Invention Services statute, Fla.St. 501.136, was declared unreasonable in *Shevin v. International Inventors, Inc.*, 353 So.2d 89 (Fla. 1977) (per curiam), on the basis that it imposed the unreasonable burden of requiring developers to obtain and maintain this information and placed developers in the hazardous position of making a misstatement of fact. We do not reach this conclusion. It is clear from the record before us that a success ratio can be constructed without unreasonable difficulty.

Two facts are necessary to compute the success ratio: the total number of customers and the amount of money received by the customer in excess of his fees paid to the developer. The testimony at trial indicated that calculation of the total number of customers is not impossible. Because the Act did not take effect until 1977, plaintiff presented testimony that it had kept a tally

of the number of its clients for the last 24 months of its 33 months of operation. Thus, the first fact required to calculate the ratio is available. Assuming that a record of fees received from customers is maintained by IMI, the amount of money received in excess of the fees paid by a customer can be computed if the amount of money received by each customer can be determined. Although plaintiff's president, Martin Berger, testified that IMI had not kept records of the net profit received by customers, he did state that IMI was in the process of publishing a list of inventions which had produced financial gain. The data to make this calculation is available because all royalties are paid directly to IMI so that IMI may retain its 20 percent share of the profits. Based on this evidence, we conclude that the facts necessary to compute the *success ratio* are available. Furthermore, the number of calculations necessary at present to meet the statutory requirement is minimal, since only five to ten Minnesota customers out of the 200 represented have received returns on an invention exceeding the amounts paid to IMI.

We also note that IMI of Pennsylvania, an affiliate of IMI of Minnesota, has agreed to comply with certain requirements imposed by the Federal Trade Commission, including the requirement to disclose to customers the financial gain realized by all customers since February of 1975.[2] Financial gain is defined by the Federal Trade Commission as an amount of money greater than the amount of money paid by a client to IMI. That provision requires no less calculation or compilation of data than that required by the Minnesota provision. Martin Berger's testimony that he was compiling information to satisfy the federal requirement indicates that compliance with the Minnesota statute is possible.

 Plaintiff next challenges § 325A.02, subd. 2, and § 325A.05, subd. 2, which read:

"325A.02, subd. 2. If one or more contracts are contemplated by the invention developer in connection with an invention or if the invention developer contemplates performance of services in connection with an invention in more than one phase with the performance of each phase covered in one or more contracts, the invention developer shall so state in a written statement and shall supply to the customer the written statement together with a copy of each contract or a written summary of the general terms of each contract, including the total cost or consideration required from the customer, before the customer signs the first contract."

"325A.05, subd. 2. The disclosure shall state the median fee charged to all of the invention developers customers who have signed contracts with the developer in the preceding six months, excluding customers who have signed in the preceding 30 days."

Plaintiff's attack on § 325A.02, subd. 2, focuses on the requirement that the invention developer predict at the outset what further contracts and services will be appropriate for each invention and the costs of those contracts. The evidence does not support plaintiff's contention that compliance is impossible. The only evidence of impossibility of performance was the testimony of Steven Sencer, IMI regional director in Minneapolis-St. Paul. Sencer testified that the cost of the first contract, the evaluation agreement, is $350 but that the exact cost of the representation agreement is not known until after the evaluation contract is completed, usually within eight to ten weeks. The exact cost of each representation contract is determined by the national director of IMI. Other evidence shows, however, that IMI uses standard forms for the evaluation and representation contracts which set out the general terms of the

**2.** Following an investigation of the business practices employed by IMI of Pennsylvania, the Federal Trade Commission entered negotiations with IMI of Pennsylvania culminating in an "Agreement Containing Consent to Order to Cease and Desist, In the Matter of Invention Marketing, Inc. and Martin S. Berger." FTC File No. 762–3075. At the time of this declaratory judgment action, IMI had signed the agreement but it had not yet been finally accepted by the Federal Trade Commission.

contracts. To require disclosure of these terms is neither impossible nor unreasonable. With respect to the required disclosure of the cost of future contracts, plaintiff presented testimony that only two agreements are signed. Since the total cost of the first contract ($350) is known, the only unknown cost is that of the representation contract, and plaintiff has statistics which show that the price of a representation contract could go as high as $2,000 but that the norm fee is $1,600. These same statistics provide a basis for determining the median fee. Minn.St. 325A.05, subd. 2.

■ Plaintiff also challenges § 325A.04, subd. 7,[3] which provides that:

"The contract shall state the expected date of completion of the invention development services."

Plaintiff argues that it cannot comply with subdivision 7 because its contracts continue indefinitely. Plaintiff's standard representation contract contains, however, a clause setting forth a definite term of exclusive representation. For purposes of this declaratory judgment action, we conclude that plaintiff has not proved subdivision 7 to be unreasonable.

■ Plaintiff asserts that the bonding requirement of § 325A.06 is confiscatory. Minn.St. 325A.06 provides:

"Subdivision 1. Every invention developer rendering or offering to render invention development services in this state shall maintain a bond issued by a surety admitted to do business in this state, and equal to either ten percent of the invention developer's gross income from the invention development business in this state during the invention developer's preceding fiscal year, or $25,000, whichever is larger. A copy of the bond shall be approved by the attorney general and filed with the secretary of state before the invention developer renders or offers to render invention development services in this state. The invention developer

shall have 90 days after the end of each fiscal year within which to change the bond as may be necessary to conform to the requirements of this subdivision.

"Subd. 2. The bond required by subdivision 1 shall be in favor of the state of Minnesota for the benefit of any person who, after entering into a contract for invention development services with an invention developer, is damaged by fraud or dishonesty of the invention developer in performance of the contract, by the insolvency or the cessation of business by the invention developer or by the intentional violation of sections 325A.01 to 325A.10 by the invention developer. Any person claiming against the bond may maintain an action at law against the invention developer and the surety company.

"The aggregate liability of the surety company to all persons for all breaches of conditions of the bond shall in no event exceed the amount of the bond.

"Subd. 3. In lieu of the bond required by subdivision 1 the invention developer may deposit with the state treasurer a cash deposit in the like amount. The state treasurer shall not refund a deposit until 60 days after either the invention developer has ceased doing business in the state or a bond has been filed which complies with subdivisions 1 and 2."

We assume that plaintiff's complaint is directed at the size of the bond, not at the bond requirement itself, since plaintiff argued to the trial court that a simple bond requirement was a reasonable substitute for the entire Act. Since no evidence was presented to demonstrate that the bond amount was in fact confiscatory, the presumption of constitutionality has not been overcome. Mere threats of being forced out of business by state regulation do not provide grounds for the judiciary to substitute its economic and social judgment for that of the legislature. *Insurers' Action Council, Inc. v. Heaton,* 423 F.Supp. 921, 924

---

**3.** In its brief, plaintiff listed subdivisions 3, 4, and 11 as being unreasonable, as well as subdivision 7, but did not present arguments against them. After reviewing plaintiff's testimony at trial concerning these provisions, we conclude that an inability to comply with the provisions because of their unreasonableness was not proved.

(D.Minn.1976). Significantly, as defendant points out, a similar bonding requirement of at least $25,000 exists in the Club Contracts Act, Minn.St. 325.96–325.965 (1976). See also Minn.St. 149.11–149.12 (1976), which requires that all prepayments for pre-arranged funerals must be held in trust until the contract is performed. The manifest legislative intent to prevent customer losses due to insolvency or disappearance of the developers addresses a well-substantiated problem. Thus, absent specific proof of confiscation, the legislative solution seems reasonable and in the best interest of the public.

In sum, we conclude, on the record before this court, that plaintiff has failed to prove beyond a reasonable doubt that the Act is onerous, arbitrary, and unreasonable within the parameters of the due process clauses of the state and federal constitutions. See, *Federal Distillers, Inc. v. State*, 304 Minn. 28, 39, 229 N.W.2d 144, 154 (1975); *Dimke v. Finke*, 209 Minn. 29, 32, 295 N.W. 75, 78 (1940).

■ Plaintiff raises an additional due process argument that the Act unconstitutionally presumes all invention development businesses are fraudulent. The Act does not contain an irrebuttable presumption such as that invalidated in *Twin City Candy & Tobacco Co., Inc. v. A. Weisman Co.*, 276 Minn. 225, 149 N.W.2d 698 (1967).[4] In response to documented cases of consumer loss and confusion, the Act merely requires that certain disclosures be made to the customer to mitigate confusion and unreasonable expectations and provides economic protection against customer losses. The Act does not pronounce the invention service industry to be fraudulent and prohibit its activity.

2. Vagueness.

■ Plaintiff argues that the Act must be set aside as unconstitutionally vague and

ambiguous. Since enforcement of the Act is enjoined pending this appeal, our review is limited to whether the challenged provisions are unconstitutional on their face, not whether they might be unconstitutional in a hypothetical situation. *Federal Distillers, Inc. v. State*, 304 Minn. 28, 39, 229 N.W.2d 144, 154 (1975). The standard of review which is applicable here was set forth in *Wichelman v. Messner*, 250 Minn. 88, 111, 83 N.W.2d 800, 819, 71 A.L.R.2d 816, 839 (1957):

"A statute will not be declared void for vagueness and uncertainty where the meaning thereof may be implied, or where it employs words in common use, or words commonly understood, or words previously judicially defined, or having a settled meaning in law, or a technical or other special meaning well enough known * * *, or an unmistakable significance in the connection in which they are employed. In short, legislation otherwise valid will not be judicially declared null and void on the ground that the same is unintelligible and meaningless unless it is so imperfect and so deficient in its details as to render it impossible of execution and enforcement, and is susceptible of no reasonable construction that will support and give it effect, and the court finds itself unable to define the purpose and intent of the legislature."

Plaintiff isolates several terms used in the Act, which it contends vague and ambiguous:

(1) "develop or promote" (Minn.St. 325A.01, subds. 2, 5);

(2) "if one or more contracts are *contemplated* by the invention developer in connection with an invention" (emphasis supplied) (Minn.St. 325A.02, subd. 2);

(3) the success ratio (Minn.St. 325A.04, subd. 6; 325A.05, subd. 3); and

---

4. In *Twin City Candy & Tobacco Co., Inc. v. A. Weisman Co.*, 276 Minn. 225, 149 N.W.2d 698 (1967), we held that the presumption that all sales of cigarettes below cost are with the intent or effect of injuring a competitor was violative of due process. While the legislative purpose there was to protect the public against

price-fixing, the effect of that presumption was to deprive the seller of the opportunity to prove that a sale was made with innocent intent or without predatory effect. We did observe, however, that, if properly drafted, legislation prohibiting sales below cost would be a proper exercise of state police power.

(4) "records and correspondence relating to performance of each development contract" (Minn.St. 325A.08).

█ Plaintiff asserts that the Act must provide greater clarity and preciseness because the possibility of criminal sanctions for violations exists. The Act, however, is a civil, not criminal, statute. Although the Act in its remedies provision refers to Minn.St. 325.907, subd. 2,[5] which empowers the Attorney General to pursue violations of consumer laws, the nature of the remedies is civil, and the Act establishes no original criminal jurisdiction which can be invoked by the Attorney General.

█ Each provision cited by plaintiff as vague and ambiguous has a common meaning, is susceptible of reasonable construction, or is not impossible of enforcement. Even if those provisions could be construed in different ways, they must be construed in the manner to render them constitutional. *Hassler v. Engberg*, 233 Minn. 487, 48 N.W.2d 343 (1951). Thus, under the limited standard of review applicable here, we hold that the Act is not unconstitutionally vague.

3. Equal Protection.

█ The final issue raised is whether the Act denies plaintiff equal protection of the law by excluding certain other entities from regulation. Minn.St. 325A.01, subd. 5(5), provides:

"Subd. 5. 'Invention developer' means any person, firm, corporation or association and the agents, employees or representatives of the person, firm, corporation or association which develops or promotes or offers to develop or promote an invention of a customer in order that the customer's invention may be patented, licensed or sold for manufacture or manufactured in large quantities, except the term does not include: * * * (5) any person, firm, corporation, association or other entity whose gross receipts from contracts for invention development services do not exceed ten percent of its gross receipts from all sources during the fiscal year preceding the year in which any contract for invention development services is signed."

The current test for analyzing classifications in economic regulations is set forth in *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511, 516 (1976):

"When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. See, e. g., *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973). Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions pre-

5. Minn.St. 325.907, subd. 2, provides as follows: "Subd. 2. Attorney General to assist in discovery and punishment of illegal practices. When the attorney general, from information in his possession, has reasonable ground to believe that any person has violated, or is about to violate, any of the laws of this state referred to in subdivision 1, he shall have power to investigate those violations, or suspected violations, and to take such steps as are necessary to cause the arrest and prosecution of all persons violating any of the statutes specifically mentioned in subdivision 1 or any other laws respecting unfair, discriminatory, or other unlawful practices in business, commerce, or trade. In connection with investigation under this section the attorney general upon specifying the nature of the violation or suspected violation may obtain discovery from any person regarding any matter, fact or circumstance, not privileged, which is relevant to the subject matter involved in the pending investigation, in accordance with the provisions of this subdivision. The discovery may be obtained without commencement of a civil action and without leave of court, except as expressly required by the provisions of subdivision 2a. The applicable protective provisions of rules 26.02, 30.02, 30.04 and 31.04 of the rules of civil procedure for the district courts shall apply to any discovery procedures instituted pursuant to this section. The attorney general or any person to whom discovery is directed may apply to and obtain leave of the district court in order to reduce or extend the time requirements of this subdivision, and upon showing of good cause the district court shall order such a reduction or extension. * * * *"

sume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. Legislatures may implement their program step by step, *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations. See, e. g., *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488–489, 75 S.Ct. 461, 464–465, 99 L.Ed. 563 (1955). In short, the judiciary may not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines, see, e. g., *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 423, 72 S.Ct. 405, 96 L.Ed. 469 (1952); in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment. See, e. g., *Ferguson v. Skrupa*, 372 U.S. 726, 732, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963)."

Accord, *Insurers Action Council, Inc. v. Heaton*, 423 F.Supp. 921, 926 (D.Minn.1976); *Federal Distillers, Inc. v. State*, 304 Minn. 28, 229 N.W.2d 144 (1975); *George Benz Sons, Inc. v. Ericson*, 227 Minn. 1, 34 N.W.2d 725 (1948). Plaintiff contends that the exclusion of large corporations, which offer invention services to the public as an insignificant part of their business activity, as well as the exclusion of small-scale, part-time developers, is a violation of the equal protection clause. We find that the distinction between the classes of developers excluded from regulation and the class of developers to which plaintiff belongs is not arbitrary or capricious, but instead is real and substantial. See, *Schwartz v. Talmo*, 295 Minn. 356, 205 N.W.2d 318 (1973), appeal dismissed, 414 U.S. 803, 94 S.Ct. 130, 38 L.Ed.2d 39 (1973). While the problems associated with full-time, profit-oriented development companies are well-documented, the record lacks any evidence of deceptive activities or customer losses through developer insolvency attributable to large corporations with a minimum of ancillary development services or to the small-scale, part-time developer. By subjecting development activities to regulation only when the developer's receipts from customers exceed 10 percent of his gross income, the Act addresses only those situations which present a genuine potential for abuse.

Affirmed.

TODD, J., took no part in the consideration or decision of this case.