STATE of Minnesota, by its Attorney
General, Hubert H. HUMPHREY,
III, Respondent,

v.

RI–MEL, INC., et al., Defendants,

D. Leonard Rice, et al., Appellants,

Kenneth Melby, et al., Defendants.

No. C3–87–436.

Court of Appeals of Minnesota.

Dec. 15, 1987.

Review Denied Feb. 17, 1988.

Hubert H. Humphrey, III, Atty. Gen., Robert C. Long, Norine Olson–Elm, Sp. Asst. Attys. Gen., St. Paul, for respondent.

Stephen J. Foley, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for appellants.

Heard, considered and decided by FORSBERG, P.J., and LANSING and NIERENGARTEN, JJ.

## OPINION

FORSBERG, Judge.

The respondent State of Minnesota, through the attorney general, brought an action against appellants D. Leonard Rice, Shirley Rice and several other defendants. The suit alleged violations of the Minnesota Club Contracts Act and other consumer protection statutes. On December 8, 1986, the trial court entered a $581,000 default judgment against appellants D. Leonard Rice and Shirley Rice for their failure to fully comply with three discovery orders and an order to show cause, which directed them to appear personally and show cause why a default judgment and an adjudication of contempt should not be entered. Subsequently, appellants obtained new counsel and moved to vacate the default judgment. On February 26, 1987, the trial court orally denied appellants' motion to vacate the default judgment from the bench. The Rices appeal from the December 8 default judgment and the February 26 order denying their motion to vacate, claiming that:

(1) the Club Contracts Act is unconstitutional on its face and as applied by the attorney general and violates due process;

(2) the trial court erred in refusing to vacate the default judgment;

(3) the trial court erred in awarding the attorney general attorney fees; and

(4) the damage award against appellants is unauthorized by law and not supported by the evidence.

We affirm.

## FACTS

Appellants D. Leonard Rice and Shirley Rice, individually and as officers, directors, and controlling shareholders operated ten Spa Petite Health Clubs and four European Health Spa Clubs. The four European Health Spas, with over 6,250 members, were closed on or about December 16, 1985. The 10 Spa Petites, with over 10,000 members, were closed on February 7, 1986. None of the members could recover the value of their prepaid health services.

In December, 1985, the State of Minnesota, through the attorney general, sued appellants and the other defendants, Ri–Mel, Inc., d/b/a Spa Petite and European Health Spa; Fitness Minnesota Health Spas Corporation d/b/a European Health Spa; Bureau of Collection Recovery, Inc.; Kenneth Melby; Robert Rice; and Blake Rice and Fitness and Health, Inc. The complaint alleged Fitness Minnesota Health Spas Corporation and Bureau of Collection Recovery, Inc. are incorporated separately, but in fact function interchangeably with Ri–Mel, Inc. without regard to corporate formalities and operate from the same location as Ri–Mel's Minnesota office. Appellant D. Leonard Rice was the chairman of the board of Ri–Mel, Inc., and appellant Shirley Rice was the president of the company. When the action was commenced, appellant D. Leonard Rice was also the president of Fitness Minnesota Health Spa Corporation and allegedly controlled 50% of the stock of that company through another corporation, Self–Centers, Inc., which was owned by two of his daughters.

The state's action sought a declaratory judgment, injunctive relief, civil penalties, reasonable attorney fees, and restitution for all consumers harmed by the defendants' practices. The complaint alleged the business practices of appellants and the other defendants violated provisions of Minn.Stat. § 325F.69 (1984) (consumer fraud); Minn.Stat. § 325D.44 (1984) (deceptive trade practices); Minn.Stat. § 332.37 (1984) (collection agency practices); and Minn.Stat. § 325G.23–.27 (1984) (Club Contracts Act). Additionally, the state alleged the European Health Spa's and Spa Petite's $25,000 surety bonds were deficient under the Club Contracts Act, which required health clubs to maintain a bond at least as great as the total amount of prepayments received for all contracts of membership entered into after May 31, 1974. Minn. Stat. § 325G.27, subd. 2 (1984).

One day after defendant Fitness Minnesota Spa Corporation, d/b/a European Health Spa closed the four European Health Spa clubs on December 16, 1985, the trial court issued an order temporarily restraining defendants from removing any

assets from Minnesota or transferring any ownership interest in Spa Petite and European Health Spa clubs. By order dated December 31, 1985, the court issued a temporary injunction enjoining and restraining defendant, Fitness Minnesota Health Spa Corporation, d/b/a European Health Spa and its employees and agents, from doing any business in Minnesota until the defendants obtained a surety bond in favor of the State of Minnesota in an amount not less than $300,000. The December 31 order further directed that the European Health Spa post a $300,000 surety bond within 15 days or the attorney general may seek and have an order appointing a receiver to wind up the corporation's affairs.

On January 7, 1986, appellants and Ri-Mel, Inc. entered into a court-approved settlement agreement with the attorney general, which in part provided that Ri-Mel, Inc. would post a $75,000 bond by February 1; and as a condition of doing business agreed not to take any prepayments over $25 after February 1, 1986. The court-approved settlement was not followed and on February 7, 1986, the remaining Spa Petite clubs were closed.

By order dated February 11, 1986, the court denied the defendants' oral motion to dismiss the proceedings on constitutional grounds and issued a temporary injunction against appellants personally, precluding them from removing any corporate assets from Minnesota, and appointed a receiver, Jerry A. Bremer, a CPA, to examine Ri-Mel, Inc.'s books and records in appellants' possession. The order directed the receiver to issue a preliminary report to the court on February 19, 1986.

On February 19, 1986, the receiver reported that appellants produced some, but not all of the requested documents. On February 20, the court issued its first discovery order, directing appellants and Ri-Mel, Inc. to produce by February 24 all records and documents requested by the receiver. Appellants failed to comply with the February 20 order. On February 25, the court issued a second discovery order fining appellants $100 as a contempt sanction and directing them to comply with the February 20 order within 48 hours or the court would issue a bench warrant for their arrest. Appellants produced some records on February 27, 1986, but did not include records for Ri-Mel, Inc. or any of the Fitness and Health, Inc. records which they had been ordered to produce.

At a March 3, 1986 hearing, the court ordered appellants to appear for previously noticed depositions on March 19 at 9:00 a.m. and to produce requested documents. Appellants failed to appear. On March 24, the court issued another discovery order directing appellants to appear at the attorney general's office on March 26 at 9:00 a.m. for depositions and to produce the corporate records and documents. The order stated that if appellants failed to appear and produce the documents as ordered, the court would consider severe sanctions, including a default judgment. Appellants appeared without counsel at the court-ordered deposition on March 26, but refused to answer questions, except their name and date of birth, claiming fifth amendment privileges, and failed to produce documents.

On May 9, 1986, the court issued an order requiring appellants to appear personally before it on May 29 at 9:00 a.m. in order to show why they should not be held in contempt of court and why a default judgment should not be entered against them under Minn.R.Civ.P. 37.02(2)(c) for failure to comply with the court's prior discovery orders. Appellants did not personally appear. The court gave appellants until the following morning, May 30, to personally appear. They again failed to appear. At the May 30 hearing, the court orally adjudicated appellants in contempt and in default. A written order for default judgment was issued June 27, 1986.

Subsequently the court held four additional hearings, on July 3, August 12, August 20, and September 22, 1986, to determine the appropriate restitution damage award in the default judgment. Appellant D. Leonard Rice was present and testified at the hearings on August 12 and 20. Following the August 20 hearing, appellants entered into a stipulated settlement with

the attorney general, in which appellants agreed to pay $491,000 into an escrow account for restitution. Appellants failed to abide by the settlement agreement.

After appellants' failed to comply with the court-approved settlement agreement reached on August 20, the court issued an order for default judgment against appellants on November 12 for $581,000, which included $300,000 in restitution for Spa Petite members; $191,000 in restitution for European Health Spa members; $15,000 in civil penalties pursuant to Minn.Stat. § 8.31, subd. 3 (1984); $70,000 for the attorney general's costs and reasonable attorney fees pursuant to Minn.Stat. § 8.31, subd. 3a (1984); and $5,000 in contempt sanctions. Default judgment was entered on December 8, 1986.

Appellants obtained new counsel and on February 26, 1987, moved to vacate the default judgment. The court orally denied the motion.

## ISSUES

1. Is the Club Contracts Act unconstitutional on its face or as applied by the attorney general?

2. Does the Act violate due process by imposing a bond requirement which amounts to confiscation?

3. Did the trial court abuse its discretion in refusing to vacate the default judgment?

4. Did the court err in awarding attorney fees to the attorney general?

5. Does the attorney general have authority to bring an action for damages on behalf of club members and are the restitution damage awards supported by the evidence?

## ANALYSIS

### I.

A. Appellants claim the Club Contracts Act is unconstitutional on its face because

it violates federal and state equal protection guarantees by discriminating between health clubs "organized for profit" and nonprofit health clubs. The Club Contracts Act only applies to health clubs defined as "organized for profit." [1]

■ Appellants claim the standard of review to be applied in analyzing the constitutionality of the Act is the strict scrutiny standard or an intermediate standard because the Act limits the fundamental right to enter into contracts, and impermissibly restricts the contractual relationship between health clubs and its members. However, in *Essling v. Markman*, 335 N.W.2d 237 (Minn.1983) the supreme court explained that freedom of contract has not been recognized as a fundamental right sufficient to invoke strict judicial scrutiny, and thus minimum judicial scrutiny is appropriate. *Id.* at 239. Under the "rationale basis" test an Act should be upheld as constitutional if the record shows the Act is rationally related to achievement of a legitimate government purpose. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 723–24, 66 L.Ed.2d 659 (1981); *Guilliams v. Commissioner of Revenue*, 299 N.W.2d 138, 142 (Minn.1980). There is a presumption in favor of the constitutionality of legislation and a party challenging constitutionality has the burden of demonstrating beyond a reasonable doubt a statute violates a provision of the constitution. *McGuire v. C & L Restaurant, Inc.*, 346 N.W.2d 605, 611 (Minn. 1984).

Appellants assert the legislative distinction between for profit and nonprofit health clubs is not rationally related to the purpose of the Act and bears no relation to the question whether prepayments by club members require the security of a bond. In general, the Minnesota Legislature has distinguished between the regulation of for profit and nonprofit corporations. For profit corporations are subject to the Minnesota Business Corporation Act,

---

1. Minn.Stat. § 325G.23, subd. 4 has been amended by 1987 Minn.Laws ch. 367, § 1. The words "organized for profit" have been deleted and the following sentence added: "The term

[Health Club] does not include any nonprofit organizations, any private club owned and operated by its members, or any facility operated by the state or any of its subdivisions."

Minnesota Statutes Chapter 302A, whereas nonprofit corporations are regulated under Minnesota Statutes Chapter 317. The purposes of for profit corporations and non-profit corporations are different. A corporation by definition is "organized for profit," whereas a nonprofit corporation is not formed for the purpose of pecuniary gain to its shareholders or members (other than to members which are nonprofit organizations). *See* Minn.Stat. §§ 302A.011, subd. 8 and 317.02, subd. 5 (1986).

The purpose of the Club Contracts Act is to protect consumers by preventing the collection by corporations of large "prepayments" to capitalize the venture and then closing their business without providing services or making refunds. *See* February 26, 1974 Senate Labor and Commerce Committee Hearing on Senate File # 3123 and March 1, 1974 House Commerce and Economic Development Committee Hearing on House File # 3246. The Act achieves this purpose by requiring for profit clubs to post surety bonds to protect members from loss of money if the club should cease doing business unexpectedly without adequate funds to make refunds to consumers.

The Club Contracts Act was substantially amended in 1987 and questions arose in the Senate Commerce Committee on Senate File # 772 specifically concerning equal protection challenges to the legislation. There was discussion indicating that historically there have not been the same problems with nonprofit organizations. The Minnesota Attorney General's Office argues it is unaware of any nonprofit health club in Minnesota ever going out of business after taking consumer prepayments. There has been no showing that the harms sought to be protected against by the Act have occurred in nonprofit organizations or clubs offering health or fitness facilities. Nonprofit health clubs do not have the same incentive to use high pressure sales tactics or to take large prepayments to maximize profits.

Fifteen other state legislatures have instituted statutes regulating health clubs which include distinctions between nonprofit and profit clubs. *See* Ariz.Rev.Stat.Ann. § 44–1792 (Supp.1986); Conn.Gen.Stat. § 21a–216 (1987); Fla.Stat.Ann. § 501.012 (West Supp.1987); Haw.Rev.Stat. § 486N–1 (1985); Ill.Rev.Stat., ch. 29 ¶ 56 (Supp.1987); Ind.Code Ann. § 24–5–7–1 (West Supp.1987); Ky.Rev.Stat. § 367.900 (1987); Md.Com.Law Code § 14–12B–01 (Michie Supp.1987); Miss.Code Ann. § 75–83–1 (Supp.1987); N.H.Rev.Stat.Ann. 358–I:1 (1984); R.I.Gen.Laws § 5–50–1 (Michie Supp.1986); Tenn.Code Ann. § 47–18–301 (1984); Tex.Civ.Stat., art. 5221*l* (West Supp.1987); Va.Code § 59.1–296 (1987); and Wisc.Stat.Ann. § 134.70 (West Supp.1987).

■ The Club Contracts Act distinction between profit and nonprofit organizations is a permissible one, rationally related to the legitimate purpose of minimizing potential harms which have occurred in for profit clubs. Therefore, the Act is not unconstitutional on its face as a violation of equal protection guarantees. *See Invention Marketing, Inc. v. Spannaus,* 279 N.W.2d 74, 82 (Minn.1979) (Invention Services Act, Minn.Stat. § 325A.01–.10 does not deny equal protection of the law by excluding certain entities from regulation where the record lacks any evidence of the same harms occurring in the excluded entities).

B. · Appellants claim the Club Contracts Act is unconstitutional as applied by the attorney general because the state is consciously adopting an arbitrary and discriminatory policy of enforcing the Act only against health clubs which do not have facilities for tennis or other racket sports. Appellants assert that tennis and racket facilities fall within the definition of a "health club" and the attorney general has been arbitrary and discriminatory in not applying the Act to those facilities.

■ There is a presumption of regularity in governmental decisions and the burden of proving arbitrariness or discrimination is on the person challenging the governmental action. *See Draganosky v. Minnesota Board of Psychology,* 367 N.W. 2d 521, 526 (Minn.1985) (citing *City of Moorhead v. Minnesota Public Utilities Commission,* 343 N.W.2d 843, 849 (Minn. 1984)). The unequal application of the stat-

ute by state officers is not a denial of equal protection unless the challenging party shows by a clear preponderance that there was intentional or purposeful discrimination. *Draganosky,* 367 N.W.2d at 526 n. 4 (citing *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944)); *City of Minneapolis v. Buschette,* 307 Minn. 60, 66, 240 N.W.2d 500, 503 (1976). Although there are questions concerning the proper interpretation of a "health club" as defined in Minn.Stat. § 325G.23, subd. 4 (1984), appellants have not shown there has been intentional or purposeful discrimination in enforcement of the Act.

## II.

Appellants claim the amount of the bond requirement under the Act violates due process because it amounts to a confiscation of business assets. Minn.Stat. § 325G.27, subd. 2 (1984) (now amended by 1987 Minn.Laws ch. 367, § 4) formerly provided:

> Subd. 2. Every health club or social referral club shall maintain a bond issued by a surety company admitted to do business in this state the principal sum of which shall be at all times at least as great as the total amount of prepayment received for all contracts of membership entered into after May 31, 1974.

■ The "legislature is empowered to enact legislation for the purpose of public health or general welfare which is legitimately or reasonably related to that purpose." *State v. Century Camera, Inc.,* 309 N.W.2d 735, 745 (Minn.1981) (citing *City of St. Paul v. Dalsin,* 245 Minn. 325, 329, 71 N.W.2d 855, 858 (1955)). It is well established that the state may legislate to promote the economic welfare of its citizens and may adopt whatever economic policy it deems will promote the public good. *Federal Distillers, Inc. v. State,* 304 Minn. 28, 45–46, 229 N.W.2d 144, 157 (1975), *appeal dismissed,* 423 U.S. 908, 96 S.Ct. 209, 210, 46 L.Ed.2d 137 (1975). Due process only demands that an economic regulation (1) serve to promote a public purpose, (2) not be unreasonable, arbitrary or capricious in appearance, and (3) the

chosen means have a rational relation to the public purpose sought to be served. *Id.,* 304 Minn. at 46, 229 N.W.2d at 157–58.

■ Although it appears the former bond provision under the Act was a stringent burden on for profit clubs, the requirement of a bond to protect consumers is a proper exercise of the state's regulatory powers. Since there is no evidence showing the bond amount was "in fact confiscatory, the presumption of constitutionality has not been overcome." *Invention Marketing, Inc.,* 279 N.W.2d at 79. Under this record, appellants have not shown the former bond provision violated due process.

## III.

■ Appellants claim the court erred in refusing to vacate the default judgment. A court is vested with authority to render a judgment by default against a disobedient party who fails to comply or respond to discovery orders or requests. Minn.R.Civ. P. 37.02(2)(c) and 37.04; *see generally O'Neil v. Corrick,* 307 Minn. 497, 239 N.W. 2d 230 (1976); *Williams v. Grand Lodge of Freemasonry,* 355 N.W.2d 477 (Minn.Ct. App.1984), *appeal dismissed,* 472 U.S. 1023, 105 S.Ct. 3492, 87 L.Ed.2d 625 (1985). The decision whether to vacate a default judgment falls within the sound discretion of the trial court and will not be reversed unless there is an abuse of discretion. *Kosloski v. Jones,* 295 Minn. 177, 180, 203 N.W.2d 401, 403 (1973).

■ Although a judgment by default runs contrary to the primary objective of the law to dispose of claims on their merits, courts must be provided broad discretion to enforce calendar rules and prevent unnecessary and inexcusable delays. *Housing and Redevelopment Authority v. Kotlar,* 352 N.W.2d 497, 499 (Minn.Ct.App.1984); *see also Firoved v. General Motors Corp.,* 277 Minn. 278, 152 N.W.2d 364 (1967). A party who willfully and without justification or excuse fails to comply with discovery orders with an intent to delay trial and continues to refuse to cooperate with the court forfeits the right to a trial on the

merits. *Breza v. Schmitz*, 311 Minn. 236, 237, 248 N.W.2d 921, 922 (1976).

The record reflects the appellants disregarded court orders and the rules of discovery and caused unnecessary delays and wasted valuable judicial time. On February 20, the court ordered appellants to produce certain documents by February 24. The documents were not produced as ordered. On February 25, the court issued another order requiring appellants to produce the requested records within 48 hours or the court would issue a bench warrant for their arrests. On February 27, appellants did produce a number of records but failed to include records from the Security Bank of Nevada for Ri–Mel, Inc. or of the Fitness and Health, Inc.

Appellants' depositions were scheduled, but subsequently cancelled a number of times because of appellants' promises to cooperate and settle this matter. Those promises were not honored. At a hearing on March 3, 1986, the attorney general served appellants' counsel with notices of taking depositions and demands for production of documents for appellants for March 25. Because appellants' counsel was unavailable on March 25, the court ordered appellants to appear for depositions and produce certain documents on March 19. On March 19, neither appellants nor their counsel appeared. By order dated March 24, 1986, appellants were to appear for depositions on March 26 and produce the documents described by the court. On March 26, appellants appeared for their depositions without representation by counsel and invoked the fifth amendment. The appellants again failed to produce all of the documents required by the discovery orders.

By letter to appellants' counsel dated April 9, 1986, the state's counsel described the documents appellants had failed to produce in violation of the court's March 24 discovery order and requested appellants comply with the discovery order by April 21, 1986. Appellants again failed to produce any of the required documents by April 21. A second letter, dated April 22, was again forwarded to appellants' counsel and requested the documents described in the April 9 letter, as required by the court's March 24 discovery order. Appellants again failed to produce any of the required documents. On May 9, 1986, the court issued an order requiring appellants to personally appear on May 29, 1986, to show cause why they should not be held in contempt and why a default judgment should not be entered against them pursuant to Minn.R.Civ.P. 37.02. Appellants failed to personally appear on May 29. However, appellants' counsel did appear and produced some but not all the documents the court requested.

Appellants' counsel informed the court that appellants were personally notified of the May 29 hearing and had been given copies of the court's May 9 order to show cause requiring them to appear on May 29. Appellants were aware that if they did not appear a default judgment could be entered against them. Appellants' counsel also told the court that after the May 29 hearing he telephoned appellants and left a message on their answering machine that they had to appear on the morning of May 30 by 10:20 or the court may enter a default judgment, and instructed them to call back. Counsel said he had a 24 hour answering service and he had not received a call from appellants. Appellants' counsel also said he telephoned appellants and left another message on their answering machine on the morning of May 30. On May 30, appellants failed to appear and the court orally adjudicated appellants in default and in contempt.

Although some of the problems in discovery and appellants' actions may be attributable to advice of former counsel, the last straw prompting the default judgment was appellants' decision not to appear before the court as ordered. Up until the May 30 hearing, the trial court had been extremely patient in dealing with the discovery problems. In personally choosing not to appear, appellants prevented the trial court from questioning them and attempting to clarify the status of the records and other discovery problems in the appeal. Appellants were aware that their violation of the court order could lead to a default judgment and have not established a reasonable excuse for their failure

to personally appear before the court. In general, appellants' conduct caused inexcusable delays and prejudiced the state's efforts to promptly resolve the action for the benefit of club members.

Although appellants may have had viable defenses to some of the state's claims, including the protection against personal liability or limited liability [2] for the activities of the corporations, if parties refuse without justification or excuse to comply with discovery orders, they forfeit their right to a trial on the merits. *See Breza*, 311 Minn. at 237, 248 N.W.2d at 922.

 The entry of a default judgment is equivalent to an admission by the defaulting party to properly pleaded claims and allegations. *See American Central Corp. v. Stevens Van Lines, Inc.*, 103 Mich.App. 507, 512, 303 N.W.2d 234, 236 (1981). The appellants were named individually as defendants in the complaint. The complaint claimed the violations were performed by the defendants personally, or under their supervision, control and direction, or with their consent or acquiescence, and that defendants engaged in fraudulent and deceptive practices in connection with the operation of their health club corporations. Default judgment was properly entered against appellants individually since the claims in the complaint are deemed admitted and appellants forfeited their right to a trial on the merits.

Appellants noted for the first time in their reply brief and at oral argument that the order to show cause was not personally served on appellants and that service on their counsel was insufficient. This matter is not properly before this court and will not be considered. *See* Minn.R.Civ.App.P. 128.02; *Gummow v. Gummow*, 356 N.W. 2d 426, 428 (Minn.Ct.App.1984) (new matters may not be raised in a reply brief).

### IV.

 Appellants claim the trial court erroneously awarded the attorney general at-

torney fees under Minn.Stat. § 8.31, subd. 3a. Minn.Stat. § 8.31, subd. 1 (1984) [3] provides:

> Subdivision 1. **Investigate offenses against the provisions of certain designated sections; assist in enforcement.** The attorney general shall investigate violations of the law of this state respecting unfair, discriminatory and other unlawful practices in business, commerce, or trade, and specifically, but not exclusively, the act against unfair discrimination and competition (sections 325D.01 to 324D.08), the unlawful trade practices act (sections 325D.09 to 325D.16), the automobile dealer's anticoercion act (sections 325D.17 to 324D.29), the antitrust act (sections 325D.49 to 324D.66), section 325F.67 and other laws against false or fraudulent advertising, the antidiscrimination acts contained in section 325D.67, the act against monopolization of food products (section 325D.68), and the prevention of consumer fraud act (sections 325F.68 to 325F.70) and assist in the enforcement of those laws as in this section provided.

Minn.Stat. § 8.31, subd. 3a (1984) in part provides:

> Subd. 3a. **Private remedies.** In addition to the remedies otherwise provided by law, *any person* injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and *reasonable attorney's fees*, and receive other equitable relief as determined by the court. * * * *In any action brought by the attorney general pursuant to this section, the court may award any of the remedies allowable under this subdivision.*

(Emphasis added.)

Although the Club Contracts Act is not explicitly enumerated in Minn.Stat. § 8.31,

---

**2.** However, it does not appear appellants asserted the defense of immunity from personal liability or limited immunity for the activities of the corporations in their answer, nor raised the issue in the trial court. Appellants indicate all

corporate defendants in this case are now in bankruptcy or nonexistent.

**3.** Minn.Stat. § 8.31, subd. 1 has been amended by 1987 Minn.Laws ch. 384 art. 2 § 2.

subd. 1, the state's action also pleaded claims of violations of unfair and unlawful business practices and consumer protection statutes, including Minn.Stat. § 325F.69, subds. 1 and 4, which is specifically identified within the statute. Thus, since all the claims against appellants were adjudicated by default and at a minimum, a portion of the action clearly fell within the parameters of Minn.Stat. § 8.31, subd. 1, the court was authorized to award attorney fees pursuant to Minn.Stat. § 8.31, subd. 3a. The trial court was also authorized to award attorney fees for the failure to comply with the discovery orders pursuant to Minn.R. Civ.P. 37.02.

## V.

■ A. Appellants claim the $491,000 damage award for restitution is unauthorized by law because the remedies available to the attorney general under Minn.Stat. § 325G.28 do not include or authorize the attorney general to sue for "restitution" on behalf of club members. The state claims it has express statutory authority to bring the action for restitution on behalf of club members under Minn.Stat. § 8.31, subd. 3a (1984) which in part provides: "In any action brought by the attorney general pursuant to this section, the court may award any of the remedies allowable under this subdivision."

In *Morris v. American Family Mutual Insurance Co.*, 386 N.W.2d 233 (Minn. 1986), the supreme court held that a private remedy under Minn.Stat. § 8.31, subd. 3a could not be extended beyond the list of laws enumerated in subdivision 1 unless it can be shown the legislature specifically contemplated that the particular statute be within the ambit of subdivision 1. The Club Contracts Act is not enumerated under Minn.Stat. § 8.31, subd. 1 and it does not appear the legislature contemplated that actions based on violations of the Club Contracts Act should be governed by Minn. Stat. § 8.31.

The Club Contracts Act was enacted after Minn.Stat. § 8.31 and includes a specific provision authorizing the attorney general to investigate violations of the Act and specifically enumerates remedies available both to the attorney general and a person injured by a violation of the act. Minn. Stat. § 325G.28 (1984) provides:

Subdivision 1. The attorney general shall investigate violations of sections 325G.23 to 325G.28, and when from information in his possession he has reasonable ground to believe that any person has violated or is about to violate any provision of sections 325G.23 to 325G.28, or that any club is insolvent, he shall be entitled on behalf of the state (a) to sue for and have injunctive relief in any court of competent jurisdiction against any such violation or threatened violation without abridging the penalties provided by law; (b) to sue for and recover for the state, from any person who is found to have violated any provision of sections 325G.23 to 325G.28, a civil penalty, in an amount to be determined by the court, not in excess of $25,000; and in case the club has failed to maintain the bond required by sections 325G.23 to 325G.28, or is insolvent or in imminent danger of insolvency, to sue for and have an order appointing a receiver to wind up its affairs. All civil penalties recovered under this subdivision shall be deposited in the general fund of the state treasury.

Subd. 2. In addition to the remedies otherwise provided by law, any person injured by a violation of any of the provisions of sections 325G.23 to 325G.28, may bring a civil action and recover damages, together with costs and disbursements, including reasonable attorney's fees, and receive other equitable relief as determined by the court.

Minn.Stat. § 325G.28, subd. 1 authorizes the attorney general to sue for: (1) injunctive relief; (2) a civil penalty for the state not in excess of $25,000; and (3) an order appointing a receiver to wind up affairs under certain circumstances. Minn.Stat. § 325G.28, subd. 2 also authorizes any person injured by a violation of the Act to bring a civil action to recover damages, costs, and reasonable attorney fees. The statute does not authorize the attorney general to bring an action on behalf of those individual persons. Subdivision 1

also does not provide that the remedies enumerated under that provision are in addition to remedies otherwise provided by law.

In general, specific provisions of one statute control the general provisions of a conflicting statute. Minn.Stat. § 645.26, subd. 1. It does not appear the legislature intended Minn.Stat. § 8.31, subd. 3a shall govern actions brought by the attorney general for violations of the Club Contracts Act in light of the specific investigatory powers and remedies enumerated in Minn. Stat. § 325G.28, subd. 1.

Even if the remedies under Minn.Stat. § 8.31 are available for actions concerning violations of the Club Contracts Act, Minn. Stat. § 8.31, subd. 3a only governs the *remedies* available to the attorney general if he brings an action pursuant to Minn. Stat. § 8.31. However, neither Minn.Stat. § 8.31, nor Minn.Stat. § 325G.28 authorize the attorney general to bring an *action* on behalf of club members or private parties. Therefore there is no express statutory authority for the attorney general to bring an action on behalf of club members for violations of the Club Contracts Act.

Although there is no express statutory authority for the attorney general's action for restitution on behalf of injured club members, common law has recognized that under the doctrine of *parens patriae* a state may maintain a legal action on behalf of its citizens, where state citizens have been harmed and the state maintains a quasi-sovereign interest. *State of Minnesota v. Standard Oil Co.*, 568 F.Supp. 556, 563 (D.Minn.1983). It is also established that Minnesota has a quasi-sovereign interest in protecting the economic health of its citizens. *Id.*

In *Standard Oil Co.*, the State of Minnesota, through the attorney general, brought a civil action against Standard on behalf of itself, its political subdivisions, and its citizens, for alleged violations of petroleum price regulations. Although legislation authorized individuals to seek recovery on behalf of their own interest, the United States District Court held that Minnesota may bring an action for recovery of overcharges and other damages on behalf of its citizens under the doctrine of *parens patriae*. *Id.* at 565. The court explained Minnesota has an added incentive to bring the action as *parens patriae* to assure its citizens the full benefit of the legislation and noted that individuals with small overcharges would likely not avail themselves of their individual remedy because of the burden of pursuing the action. Minnesota has a similar incentive to bring an action on behalf of club members as *parens patriae*, because injured club members may not avail themselves of their remedy under the Club Contracts Act because of the economic burden of suing on a small claim. The clubs' closings affected the economic interests of more than 16,000 citizens, and Minnesota does have a quasi-sovereign interest in protecting their economic health.

Common law has also recognized the attorney general has broad powers, which are not limited by statute, and may maintain an action for enforcement of the state's laws and for the protection of public rights. *See Slezak v. Ousdigian*, 260 Minn. 303, 308, 110 N.W.2d 1, 5 (1961); *see generally Head v. Special School District No. 1*, 288 Minn. 496, 182 N.W.2d 887 (1970), *cert. denied*, 404 U.S. 886, 92 S.Ct. 196, 30 L.Ed.2d 168 (1971). This court holds that under common law and the doctrine of *parens patriae* the state, through the attorney general, was authorized to bring an action on behalf of the injured club members.[4]

■ B. Appellants' also claim there is insufficient evidence to support the $491,000 restitution award ($300,000 restitution for Spa Petite members and $191,000 restitution for European Health Spa members). The trial court heard extensive testimony

---

4. This holding coupled with the fact that individuals may recover attorney fees under Minn. Stat. § 325G.28, subd. 2 provides further support to our holding awarding fees to the attorney general. Since the attorney general may sue on behalf of an individual, there is no reason to refuse to award fees to the attorney general when they would have been awarded to the individual.

on the issue of damages from the court-appointed receiver Jerry Bremer, appellant D. Leonard Rice, and others. After submission of the evidence, appellants, through their former counsel, entered into a settlement agreement on August 20, 1986, in which they agreed to pay $491,000 into an escrow account controlled by the court for purposes of awarding restitution to club members. Appellants failed to honor the agreement. In light of appellants' agreement to pay $491,000 in restitution and considering the totality of the evidence, the trial court properly awarded $491,000 in restitution.

## DECISION

The Club Contracts Act is not unconstitutional as a denial of equal protection, nor have appellants shown the Act is unconstitutional as applied or constitutes a violation of due process. The trial court did not abuse its discretion in refusing to vacate the default judgment and had authority to award attorney fees. The attorney general had authority to bring an action on behalf of club members, and the trial court did not err in awarding $491,000 in restitution to club members.

Affirmed.