**STATE OF MINNESOTA
IN COURT OF APPEALS
A24-0171**

In the Matter of the Welfare of the Child of: T. M. A. and M. J. R., Parents.

**Filed September 9, 2024
Affirmed
Ede, Judge**

Itasca County District Court
File No. 31-JV-23-1873

Jennifer L. Thompson, JLT Law & Mediation, Litchfield, Minnesota (for appellant-father T.M.A.)

Jacob P. Fauchald, Itasca County Attorney, Michael J. Haig, Chief Assistant County Attorney, Grand Rapids, Minnesota (for respondent Itasca County Health and Human Services)

Rachel Hughes, Grand Rapids, Minnesota (guardian ad litem)

Considered and decided by Ross, Presiding Judge; Ede, Judge; and Schmidt, Judge.

## SYLLABUS

An order transferring permanent legal and physical custody of a child under Minnesota Statutes section 260C.517 (2022) does not violate a parent's substantive due-process rights to freedom of contract.

## OPINION

**EDE**, Judge

In this appeal from an order transferring permanent legal and physical custody of appellant's child, appellant argues (1) that the district court abused its discretion in issuing the transfer-of-custody order and (2) that the order violates appellant's procedural and substantive due-process rights. We affirm.

**FACTS**

Prior to January 2024, appellant T.M.A. (father) had sole legal and physical custody of his son (the child), who was born in 2007 and has type 1 diabetes.

***Child in Need of Protection or Services (CHIPS) Proceedings***

In July 2022, Itasca County Social Services Agency (the agency) filed a CHIPS petition. A district court ruled that the petition alleged a prima facie case of endangerment and that there was factual support to order removal of the child from father's custody on an ex parte emergency basis. The allegations included information that medical providers at a hospital found the child to be malnourished and exhibiting symptoms consistent with high blood sugar levels. Several months later, the district court granted the agency's motion to dismiss the petition.

On November 7, 2022, the agency filed another CHIPS petition. The same day, the district court in that matter held an emergency protective-care hearing. Neither parent appeared. The district court again ruled that the agency had made a prima facie showing that the child was in need of protection or services. In addition, the district court determined that it was contrary to the welfare of the child to be returned home and that placement outside the home was in the child's best interests.

The district court held a pretrial conference in December 2022. Again, neither parent appeared. Through default proceedings held in father's absence,[1] the district court adjudicated the child to be in need of protection or services under Minnesota Statutes

---

[1] *See* Minn. R. Juv. Prot. P. 18.01, .02 (addressing a party's failure to appear in a juvenile-protection matter and default orders).

section 260C.007, subdivisions 6(3), (8), and (9) (2022). The district court approved an out-of-home-placement plan (case plan) and directed the agency to implement it. The case plan set forth several tasks for father to complete. Father was to remain sober, submit to random drug testing, complete a chemical-health evaluation, permit announced and unannounced visits, participate in mental-health services, contact his social worker weekly, and ensure that the child was attending school.

In May 2023, the district court held a permanency progress review hearing. Following that hearing, the district court filed findings of fact, conclusions of law, and an order in which it found that father had made no progress on the tasks outlined in the case plan. Father had failed to submit to random drug tests, complete a chemical-health evaluation and follow any resulting recommendations, permit visits to his home, and maintain safe, stable, and chemically free permanent housing for himself and the child. The district court determined that it was appropriate for the agency to file a permanency petition.

***Permanency Proceedings***

In July 2023, the agency petitioned to terminate father's parental rights. After an admit/deny hearing, the district court ruled that the agency had made a prima facie showing that, following the child's placement outside the home, reasonable efforts, under the direction of the court, had failed to correct the conditions leading to the child's placement. In August 2023, the agency filed an amended petition requesting that—rather than terminate father's parental rights—the district court transfer permanent legal and physical custody of the child to proposed custodians, who are the child's relatives and with whom

3

the child was placed after the child's court-ordered removal from father's custody. The agency also filed a social worker's affidavit that outlined the factual basis for the agency's request, which we summarize as follows.

The social worker asserted that the best interests of the child would be served by a transfer of custody for these reasons: the child needed a caregiver who could meet his needs on a consistent basis; the child had medical, chemical-health, and mental-health needs that required consistent follow-up appointments; and the child needed a caregiver who was able to demonstrate safe and stable behaviors, as well as provide constant guidance and oversight for the child's diabetic care. The social worker detailed concerns that father lacked knowledge about diabetes and that father did not understand how to ensure that the child's diabetic needs were met.

The social worker noted that, after the district court placed the child outside the home, father was unwilling to engage in reunification planning or compliance with the case plan to remedy the conditions that led to the out-of-home placement. The social worker also described offering services to father several times, which father declined based on his belief that he did not need additional support. And the social worker said that father was unresponsive to calls or text messages throughout the case and was unwilling to work with the agency to assess what steps he could take to reunify with the child.

In addition, the social worker discussed her meetings with the child throughout 2023. According to the affidavit, the child stated during each meeting that he supported his placement outside the home and would like to stay with his proposed custodians. The child also said that he felt well cared for by the custodians and that "his diabetes was managed

4

better than it had ever been[.]" And although the child was hospitalized because of diabetes-related complications in May 2023, the affidavit asserted that one of the child's custodians immediately responded to the child's needs, attended all doctor appointments, and participated in diabetic-education meetings.

The permanency matter proceeded to trial in September 2023. On the first day of trial, father moved the district court for a continuance because he had "insufficient time to review documents." The district court denied father's request.

The agency presented testimony from the prospective custodians, a school-based therapist, the social worker, and the child's mother. Father presented testimony from the child's step-grandfather, the child's paternal grandfather, the child's paternal grandmother, and father's lifelong friend. The district court also heard testimony from father, the child, and the child's guardian ad litem.

Father testified that, under the Constitution, he has "the right to not contract with an agency that is in direct violation of [his] rights." Father claimed that "the agency's contract offer"—referring to a chemical-health component of the case plan—"was unreasonable." He also admitted that he was unwilling to communicate with the social worker about the case plan.

In October 2023, the district court filed an order transferring permanent legal and physical custody of the child to the proposed custodians. But the district court deferred finalization of the order to determine eligibility of the proposed custodians for Northstar kinship assistance, which "provides medical coverage and reimbursement of nonrecurring expenses associated with obtaining permanent legal and physical custody of a child . . . ."

*In re Welfare of Child of T.M.A.*, 2 N.W.3d 328, 329 n.1 (Minn. App. 2024). The district court explained that it would later hold a hearing to review the status of the Northstar kinship assistance determinations. *Id.* at 329.

In the transfer-of-custody order, the district court explained its decision that transferring custody was in the best interests of the child. The district court made specific findings supporting its best-interests determination, including that the child's "current functioning and behaviors [had] improved since residing in the foster home" and that the "foster parents [had] worked to gain the specialized knowledge necessary to best support the child's ongoing diabetic condition." The district court also made specific factual findings about the steps that the agency took to reunify the child with father, determining that the agency's "continued efforts to engage [f]ather in working the [case plan] constituted 'reasonable efforts' pursuant to [Minnesota Statutes section 260C.517, subdivision (a)(2) (2022),] where [f]ather repeatedly refused to participate or offer any evidence that the allegations raised by the CHIPS petition had been remedied within the home." Moreover, the district court found that the agency "continued to try and engage [f]ather in the [case plan] throughout the life of the case" and that the agency "did all that it could do to involve [f]ather in reunification efforts." And the district court determined that there "was no evidence [that] any of the conditions which led to the out-of-home placement were corrected . . . so that the child [could] safely return home."

Before the district court finalized its order, and while its determination of eligibility for Northstar kinship assistance remained pending, father appealed. *Id.* at 329-30. We dismissed that appeal in a special term opinion, concluding that father had appealed from

an order that was neither final nor appealable. *Id.* at 330-31. In January 2024, following our dismissal of father's first appeal, the district court vacated the deferment it had ordered and deemed its October 2023 order final.

Father again appeals.

## ISSUES

I.      Did the district court abuse its discretion in ordering the transfer of permanent legal and physical custody?

II.     Did the transfer-of-custody order violate father's procedural and substantive due-process rights?

## ANALYSIS

**I.      The district court did not abuse its discretion in ordering the transfer of permanent legal and physical custody.**

Father contends that the district court abused its discretion in issuing the transfer-of-custody order. As explained below, father's arguments do not persuade us to reverse.

On appeal from an order transferring permanent legal and physical custody of a child, this court "review[s] the [district] court's factual findings for clear error and its finding of a statutory basis for the order for abuse of discretion." *In re Welfare of Child of D.L.D.*, 865 N.W.2d 315, 321 (Minn. App. 2015), *rev. denied* (Minn. July 20, 2015). When reviewing factual findings for clear error, appellate courts view the evidence in the light most favorable to the findings, do not find their own facts, do not reweigh the evidence, do not reconcile conflicting evidence, and "need not go into an extended discussion of the evidence to prove or demonstrate the correctness of the findings of the [district] court." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221-22 (Minn. 2021) (quotation omitted);

7

*see also In re Welfare of Child of J.H.*, 968 N.W.2d 593, 601 n.6 (Minn. App. 2021) (applying *Kenney* to a review of a juvenile-protection order), *rev. denied* (Minn. Dec. 6, 2021). In conducting clear-error review, "an appellate court's duty is fully performed after it has fairly considered all the evidence and has determined that the evidence reasonably supports the decision." *Kenney*, 963 N.W.2d at 222 (quotation omitted). A district court abuses its discretion if it makes findings of fact that lack evidentiary support, misapplies the law, or resolves discretionary matters in a manner contrary to logic and the facts on record. *Woolsey v. Woolsey*, 975 N.W.2d 502, 506 (Minn. 2022); *see also D.L.D.*, 865 N.W.2d at 322 ("A district court abuses its discretion if it improperly applies the law." (quotation omitted)).

"In a permanency proceeding under sections 260C.503 to 260C.521 of the Minnesota Statutes, a district court may order any one of six dispositions." *In re Welfare of Child of J.C.L.*, 958 N.W.2d 653, 655 (Minn. App. 2021), *rev. denied* (Minn. May 12, 2021). "One of the possible dispositions is a transfer of permanent legal and physical custody 'to a fit and willing relative.'" *Id.* (quoting Minn. Stat. § 260C.515, subd. 4 (2020)) (other citation omitted). A transfer-of-custody order must include detailed findings about:

> (1) how the child's best interests are served by the order;
>
> (2) the nature and extent of the responsible social services agency's reasonable efforts . . . to reunify the child with the parent . . . where reasonable efforts are required;
>
> (3) the parent's . . . efforts and ability to use services to correct the conditions which led to the out-of-home placement; and
>
> (4) that the conditions which led to the out-of-home placement have not been corrected so that the child can safely return home.

8

Minn. Stat. § 260C.517(a)(1)-(4) (2022). "Each of these four statutory requirements must be proved by clear and convincing evidence." *J.C.L.*, 958 N.W.2d at 656; *see also* Minn. R. Juv. Prot. P. 58.03, subd. 1 (providing that "[i]n a permanency matter other than a termination of parental rights matter, the standard of proof is clear and convincing evidence").

Below, we address each of father's challenges to the district court's findings about the above statutory requirements and the court's determination that clear and convincing evidence supports its transfer-of-custody order.

## A. Best Interests

Father challenges the district court's determination that placement with the proposed custodians is in the child's best interests. He asserts that the district court clearly erred in finding that "the home of the proposed custodians was a safer, more stable environment than" his home and that the court abused its discretion by relying on those facts in support of its best-interests ruling. In particular, father questions the district court's determinations because "the child had been in intensive care due to severe symptoms of his type 1 diabetes . . . while in the care of the proposed custodians" and "the child was continuing to smoke cannabis, use a vape pen, and drink alcohol while in the home of the proposed custodians."

"The paramount consideration in all proceedings for permanent placement of the child under sections 260C.503 to 260C.521 . . . is the best interests of the child." Minn. Stat. § 260C.001, subd. 3 (2022). "The 'best interests of the child' means all relevant

factors to be considered and evaluated." Minn. Stat. § 260C.511(a) (2022). "In making a permanency disposition order . . . the court must be governed by the best interests of the child, including a review of the relationship between the child and relatives and the child and other important persons with whom the child has resided or had significant contact." Minn. Stat. § 260C.511(b) (2022). Here, the record evidence supports the district court's finding that the proposed custodians' residence was more stable than father's home and its resulting ruling that it is in the child's best interests "to be placed in the permanent care, custody, and control" of the proposed custodians.

Before filing the underlying transfer-of-custody petition, the agency had filed a CHIPS petition in July 2022. Although a district court ultimately dismissed that CHIPS petition, it first ruled that the petition made a prima facie showing that endangerment existed because the child had presented at a hospital as malnourished and with high blood sugar levels.

In November 2022, father reported the child as a runaway. After the child was located, the agency met with the child, and the child reported that he had been out of the home for about a month and that father did not check on him during that time. The child also reported that "there [was] not much food in" father's home. The agency filed the second CHIPS petition and the district court ultimately determined that the agency had established that a juvenile-protection matter existed. In later meetings with the agency, the child consistently expressed a desire to continue to live with the proposed custodians. The child also reported that his diabetes was being managed and that he felt well cared for by the custodians.

During the permanency trial, the social worker testified that the child had struggled with "sporadic use" of marijuana. But the social worker nonetheless stated that the proposed custodians were "addressing the concerns as they [arose] and as they're made aware of it[.]" According to the social worker, the proposed custodians had "stepped up" and were "willing to do whatever [was] necessary to follow any sort of recommendations for [the child]," as well as do "whatever it takes to make sure they're fully educated in [the child's] needs." The social worker said that, since being placed with the custodians, the child's school attendance had improved and the child had been working with a recovery specialist to address his substance use. And the social worker testified that the child's need for a safe and stable environment would not be met if the child reunified with father.

Despite the child's ongoing issues with substance use, father himself testified that the custodians had the child's best interests at heart and that they had done a good job in caring for the child. Father also stated that the child had been doing better recently and that the custodians properly managed the child's medical issues. Father's testimony aligns with record evidence that, at the time the child was hospitalized in May 2023 because of diabetes-related complications, one of the proposed custodians had responded immediately to the child's needs, brought the child to the emergency room, and notified the social worker, their supervisor, and the guardian ad litem. The record likewise reflects that the proposed custodian attended all medical appointments and diabetic-education meetings during the child's three-day hospital stay.

Finally, the child testified that, although he would "love" to be reunited with father, he felt that he would "fall behind again in everything" if he and father were reunified. The

child also said that the proposed custodians have done "an awesome job" helping him with his diabetic condition, that he would like to stay with the proposed custodians, and that he thinks that remaining with the proposed custodians would be the best thing for him. *See* Minn. Stat. § 260C.212, subd. 2(b) (2022) (providing that "the factors the agency shall consider in determining the current and future needs of the child" include "the reasonable preference of the child, if the court, or the child-placing agency in the case of a voluntary placement, deems the child to be of sufficient age to express preferences").

Based on our careful review of the record, we conclude that the district court did not clearly err in finding that the proposed custodians' home provided a more stable environment for the child. We also conclude that the district court did not abuse its discretion in ruling—based on its reasonably supported factual findings—that transferring permanent legal and physical custody from father to the proposed custodians is in the best interests of the child.

## B. Reasonable Efforts

Father argues that the district court abused its discretion in ruling that the agency made reasonable efforts to reunify father and the child. Father contends that the social worker's efforts were "perfunctory and not aimed toward any true reunification" of father with the child.

Under Minnesota Statutes section 260.012(a) (2022), reasonable efforts "for rehabilitation and reunification are always required" except under circumstances not applicable here. As noted above, in an order permanently placing the child out of the home, a district court must make "detailed findings" about "the nature and extent of the

responsible social services agency's reasonable efforts . . . to reunify the child with the parent or guardian where reasonable efforts are required[.]" Minn. Stat. § 260C.517(a)(2).

Here, in determining that the agency's efforts were reasonable, the district court found that the agency drafted the case plan, attempted to work with father to implement it, and continued to engage father in the case plan throughout the length of the case. The district court also found that, "[u]nder the circumstances, the [a]gency did all that it could to involve [f]ather in reunification efforts. Unfortunately, [f]ather chose not to cooperate or comply with those efforts." The district court's findings are reasonably supported by the record.

In the affidavit accompanying the transfer-of-custody petition, the social worker stated that father was "offered a case plan on multiple occasions and refuse[d] to sign or follow through with supports or regular communication with the agency." The social worker noted that father had been "unreachable," and she detailed the many occasions in which she had tried to contact father. And the social worker explained that father was "unwilling to work with the agency to assess the conditions" of reunification and that he rejected the agency's services.

At trial, the social worker testified that the agency sought to engage father in preparing the case plan, but father was unwilling to discuss the matter. According to the social worker, father failed to follow through regarding the items outlined in the case plan after the district court adopted it. To the social worker's knowledge, father had not followed through with the court-ordered mental- and chemical-health tasks, chemical testing, parenting skills, visitation, and maintaining consistent contact with the social worker. The

13

social worker could not determine whether the conditions were corrected because "there was no level of communication or cooperation" from father.

In his own testimony, father conceded that he was unwilling to communicate with the social worker despite the worker's efforts to contact him throughout the case. Father also expressed his belief that he did not "have to jump through [the agency's] hoops" or comply with components of the case plan.

Given this record, we conclude that the district court's factual findings underlying its statutory determination that the agency made reasonable efforts to reunify father with the child were reasonably supported by the evidence. And we conclude that the district court's reasonable-efforts ruling was not an abuse of discretion.

### C. Failure to Correct Conditions that Led to Out-of-Home Placement

Father disputes the district court's ruling that placement with the proposed custodians was warranted based on his failure to correct the conditions that led to the child's out-of-home placement and his decision not to cooperate with the case plan.

"[A] case plan that has been approved by the district court is presumptively reasonable." *In re Welfare of Child. of S.E.P.*, 744 N.W.2d 381, 388 (Minn. 2008). And "[a] parent's failure to comply with a reasonable case plan results in a presumption that the parent has failed to correct the conditions leading to out-of-home placement." *In re Welfare of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012).

In support of its ruling that father failed to correct the conditions that led to the child's out-of-home placement, the district court made the following factual findings: that "none of the requirements of the [case plan had] been met by [f]ather"; that "[t]here was

14

no evidence [that] any of the conditions which led to the out-of-home placement were corrected"; that father acknowledged that he made the choice not to follow the case plan; that father was familiar with mental- and chemical-health assessments but decided not to participate in either for this case; that father "refused to communicate about his lifestyle, home environment and relationship with the child"; that there was no way to verify father's compliance with the case plan because of his refusal to cooperate; and that the social worker testified that she had no knowledge whether father completed "any of the items on the [case plan]." These findings are supported by the record.

At a December 2022 hearing, the district court approved the case plan, thereby raising the presumption that the case plan was reasonable. *See S.E.P.*, 744 N.W.2d at 388. And father's undisputed failure to comply with that presumptively reasonable case plan in turn "results in a presumption that [father] . . . failed to correct the conditions leading to [the child's] out-of-home placement." *J.K.T.*, 814 N.W.2d at 87.

Presumptions aside, the social worker testified at the permanency trial that father failed to follow through with the tasks outlined in the case plan. The social worker also noted that father told her he would not "contract" with her, meaning that father was "unwilling to sign or participate in any services or supports that" the agency offered him.

Consistent with the social worker's testimony, father stated that he did not have to comply with the case plan. Father explained that he did not want to submit to drug testing because "that would be contracting in a deal that [he did not] want to sign" and it was his right "to not incriminate [himself]." This did not stem from father's inability "to use services to correct the conditions which led to the out-of-home placement[.]" Minn. Stat.

15

§ 260C.517(a)(3). Indeed, father admitted that, in a previous CHIPS case, he had submitted to drug testing to dispel allegations about his failure to maintain sobriety even though the district court had not ordered that he do so. Father similarly acknowledged that the case plan required that he participate in mental-health services, but he did not do so despite his familiarity with the process. Father admitted that he was unwilling to communicate with the social worker and that he felt that he did not "have to jump through [the agency's] hoops[.]" On this record, we cannot say that the district court abused its discretion in ruling that father did not correct the conditions that led to the child's out-of-home placement.

Father also suggests that the district court should not have relied on his lack of cooperation in deciding to issue the transfer-of-custody order. But the district court did not transfer custody of the child solely or even primarily based on father's failure to provide information to the agency. Instead, the district court transferred custody because the trial evidence supported its statutory findings: (1) that the child's best interests are served by the transfer-of-custody order; (2) that the agency made reasonable efforts to reunify the child with father; (3) that—despite his ability to do so—father made no efforts to use services to correct the conditions that led to the child's out-of-home placement; and (4) that the conditions that led to the out-of-home placement had not been corrected so that the child could safely return home. *See* Minn. Stat. § 260C.517(a)(1)-(4). In addition, the district court issued the transfer-of-custody order because it found that the proposed custodians were fit, willing, and suitable to provide for the child's needs. *See* Minn. Stat. § 260C.515, subd. 4 (2022).

16

In sum, father has not shown that the district court misapplied the law in issuing the transfer-of-custody order. Additionally, even considering the clear-and-convincing standard of proof required in juvenile-protection matters, reasonable evidence supports the district court's findings of fact, and we are not otherwise left with the definite and firm conviction that a mistake occurred. Thus, the district court's findings of fact are not clearly erroneous. *See D.L.D.*, 865 N.W.2d at 322. Further, because those findings of fact support the district court's order transferring of permanent legal and physical custody of the child, the order is not contrary to logic and the facts on record. *See Woolsey*, 975 N.W.2d at 506; *see also J.C.L.*, 958 N.W.2d at 656. Thus, we conclude that the district court's decision to issue the transfer-of-custody order did not result from an abuse of discretion. *See D.L.D.*, 865 N.W.2d at 322.

## II. The transfer-of-custody order did not violate father's procedural and substantive due-process rights.[2]

Father asserts that the order transferring permanent legal and physical custody of the child violated his procedural due-process rights for three reasons: (A) the district court in the separate CHIPS matter did not provide him with notice of the emergency protective-care hearing, the 72-hour hold, or the CHIPS petition, as required by Minnesota Rule of Juvenile Protection Procedure 40.04; (B) the district court in the permanency case

---

[2] "Procedural due process analyzes whether fair procedures were used in depriving an individual of life, liberty, or property." *In re Welfare of Child of F.F.N.M.*, 999 N.W.2d 525, 537 n.4 (Minn. App. 2023) (citing *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)), *rev. denied* (Minn. Jan. 5, 2024). "Substantive due process bars 'certain arbitrary, wrongful government actions, regardless of the fairness of the procedures used to implement them.'" *Id.* (quoting *Boutin v. LaFleur*, 591 N.W.2d 711, 716 (Minn. 1999)).

underlying this appeal denied father's motion for a continuance of the trial on the transfer-of-custody petition; and (C) the delay in the finalization of the permanency order "substantially affected" father's "right to bring a timely appeal." Father also maintains that the order (D) violates his substantive due-process rights to freedom of contract. Father's arguments lack merit.

We begin by addressing the standard of review that applies to father's procedural due-process claims, which we discuss below in sections II.A through II.C.[3] "Whether a parent's due-process rights have been violated in a [permanency] proceeding is a question of law, which [appellate courts] review de novo." *In re Welfare of Child of D.F.*, 752 N.W.2d 88, 97 (Minn. 2008). "The parent-child relationship is among the fundamental rights protected by the constitutional guarantees of due process." *Id.* "Due process requires reasonable notice, a timely opportunity for a hearing, the right to counsel, the opportunity to present evidence, the right to an impartial decision-maker, and the right to a reasonable decision based solely on the record." *Id.* "Although the amount of process due in a particular case varies with the unique circumstances of that case, prejudice as a result of the alleged violation is an essential component of the due process analysis." *Id.* (quotation omitted).

We analyze each of father's procedural and substantive due-process arguments in turn.

---

[3] We set forth the applicable standard of review that governs father's substantive due-process claim below, in section II.D.

18

## A. Notice in Separate CHIPS Matter

First, father contends that his rights to procedural due process were violated because he was not given notice of the emergency protective-care hearing, the 72-hour hold, and the CHIPS petition.

This argument challenges the underlying juvenile-protection proceedings, in which the district court determined that the child was in need of protection or services. Father could have appealed that decision. *See, e.g.*, *In re Welfare of D.N.*, 523 N.W.2d 11, 12 (Minn. App. 1994) (appeal from default CHIPS adjudication), *rev. denied* (Minn. Nov. 29, 1994). But—as conceded by father's appellate counsel at oral argument and as shown by the lack of any appellate proceeding challenging the CHIPS determination—father did not. Because father did not appeal the district court's CHIPS adjudication, we decline to consider his procedural due-process challenge to the district court's provision of notice in that case. *See Dieseth v. Calder Mfg. Co.*, 147 N.W.2d 100, 103 ("Even though the decision of the trial court in the first order may have been wrong, if it is an appealable order it is still final after the time for appeal has expired."); *see also In re Welfare of Child of B.G.*, No. A16-1512, 2017 WL 958476, at *4 (Minn. App. Mar. 13, 2017) (applying this aspect of *Dieseth* in a permanency appeal).[4]

## B. Continuance of Permanency Trial

Second, father maintains that the district court violated his rights to procedural due process by denying his motion for a continuance of the trial on the agency's petition to

---

[4] We cite nonprecedential opinions herein as persuasive authority. Minn. R. Civ. App. P. 136.01, subd. 1(c).

transfer permanent legal and physical custody. Father explains that he moved for a continuance on the grounds that he had been served with additional disclosures, an amended permanency petition, and motions in limine, and he asserts that the district court improperly denied his motion merely because all parties were present and ready to proceed with trial. Father contends that his continuance motion was reasonable and that the district court should have granted it based on the close timing of the amended petition and the exhibit disclosures to the commencement of trial.

Appellate courts "generally review a district court's refusal to continue or reschedule a hearing for a future date for abuse of discretion[.]" *In re Welfare of Child. of G.A.H.*, 998 N.W.2d 222, 236 (Minn. 2023). But there "is a point when a denial of a continuance is so arbitrary as to violate due process." *Id.* (quotation omitted). "In assessing whether that line has been crossed in a particular case, [appellate courts] look at the reasons offered by the party seeking a continuance when the request for more time [was] made." *Id.*

On September 13, 2023—the first day of the permanency trial—the child's attorney explained that he had intended to file six motions in limine on September 6, all relating to how the child would testify, but he did not file them until the day before trial or the day of trial. The child's attorney had, however, discussed the motions with the district court at the pretrial hearing and had provided father with copies of the motions a few minutes before trial commenced. Father requested a continuance, claiming that he had "insufficient time to review the documents" and explaining that he had been served with papers both the day before trial and on the day of trial. The district court clarified that father was provided the

20

child's motions the first morning of trial and that father was served with the court's pretrial order the day before trial. Father also alleged that he received exhibits the day before trial. But the agency's counsel informed the district court that those exhibits had been served on father by mail on August 29.

The district court denied father's continuance request, reasoning that father had been upset that the trial could not be held sooner at almost all previous hearings. The September permanency trial date was the first and only time that the district court had available, and that date fell within the required timelines set forth in the Minnesota Rules of Juvenile Protection Procedure. Although the agency had filed an amended petition at a previous hearing, the district court had asked father if he still wished to proceed with the trial date, and father confirmed that he did. At that hearing, the agency had maintained that the same factual basis and the same exhibits would be offered at trial. The district court therefore determined that its decision to deny father's requested continuance would not prejudice father. The district court denied father's continuance request for those same reasons and because the parties were ready to proceed.

Based on this record, we conclude that the district court did not violate father's procedural due-process rights. *See G.A.H.*, 998 N.W.2d at 236. Although father argued that he received paperwork the day before trial, the agency's counsel told the district court that it had sent those documents to father two weeks before trial. And although father did not receive the child's motions relating to testimony until the day of trial, the child's attorney had discussed those motions at a previous hearing, such that father was aware of them. The district court also made sure to issue its pretrial order on a date that would allow father

sufficient time to review it before the commencement of trial. In addition, on multiple occasions, father requested that the district court set trial for an earlier date.

Even if we were to assume that the district court's decision to deny the continuance violated father's procedural due-process rights, father has not shown prejudice. The Minnesota Supreme Court has held that "a party challenging on constitutional or other grounds a district court's refusal to continue or reschedule a hearing must establish that the party was prejudiced in the preparation or presentation of their case so as to materially affect the outcome of the trial." *G.A.H.*, 998 N.W.2d at 238 (quotation omitted). Denial of a continuance amounts to a procedural due-process violation when "the [party] has been in some manner embarrassed or prejudiced in preparing his defense so as to materially affect the outcome of the trial." *Id.* at 238-39 (quoting *State v. Huber*, 148 N.W.2d 137, 142 (Minn. 1967)). Because father has not shown that he has been embarrassed or prejudiced in preparing his defense before the district court, we conclude that his procedural due-process challenge to the district court's decision denying his continuance request fails.

### C. Delay in Finalization of Order Transferring Permanent Legal and Physical Custody

Third, father insists that the district court's delay in determining eligibility for Northstar funding after it deferred finalization of the transfer-of-custody order "substantially affected [his] right to bring a timely appeal and his potential for restoring custody of his child."

Father, however, timely filed the appeal now before us. Moreover, Minnesota Statutes section 260C.515, subdivision 4(8), authorizes district courts to "defer finalization

of an order transferring permanent legal and physical custody to a relative when deferring finalization is necessary to determine eligibility for Northstar kinship assistance under chapter 256N." *T.M.A.*, 2 N.W.3d at 330 (quotation omitted). The statute does not require that finalization after such deferment occur within a specific timeframe. *But see id.* at 331 ("caution[ing] . . . that the district court should proceed with all deliberate speed to reach a final determination").

Given the specific circumstances of this case, we conclude that the district court proceeded with all deliberate speed and that the less-than-three-month delay between the October 2023 transfer-of-custody order and the January 2024 order vacating the deferment and deeming the October order final did not amount to a prejudicial violation of father's procedural due-process rights. *See D.F.*, 752 N.W.2d at 97. We therefore reject father's argument that the district court's decision to defer finalization of the transfer-of-custody order violated his rights to procedural due process.

### D.  Freedom of Contract

Fourth, father maintains that "the management of his child's education and medical needs between himself and certain providers constitutes a contract, and that the agency's interference with that contract is a violation of his constitutional rights as a parent." According to father, "overreaching child protection involvement . . . violates a parent's well-established right to direct the upbringing of children—unless the parent has a truly enforceable right to decline the offered 'services' by invoking freedom of contract." Whether an order transferring permanent legal and physical custody of a child under

23

Minnesota Statutes section 260C.517 violates a parent's substantive due-process rights to freedom of contract presents a novel constitutional issue of first impression.

Father first cites the contract clause of the United States Constitution, which provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]"[5] U.S. Const. art. I, § 10, cl. 1. While father suggests that the contract clause could have established a general right to freedom of contract, the Minnesota Supreme Court has explained that "[t]he concept of freedom of contract, which has been dealt with by the courts as an aspect of due process, is to be distinguished from the contract clause, U.S. Const. art. I, § 10, which prohibits the impairment of the obligation of contract." *State v. Int'l Harvester Co.*, 63 N.W.2d 547, 551-52 (Minn. 1954). Because the balance of father's argument appears grounded in his rights to freedom of contract as protected by the state and federal due-process clauses, we turn to an analysis of his contentions under that framework.[6]

---

[5] Although father does not cite it, the Minnesota Constitution similarly provides that "[n]o . . . law impairing the obligation of contracts shall be passed." Minn. Const. art. I, § 11.

[6] Even if we were to consider father's freedom-of-contract claim as arising from the federal and state contract clauses, we would still reject his argument. "The contracts clauses [of the United States Constitution and the Minnesota Constitution] prevent retroactive impairment of contracts[,]" but "[w]hen the statute was in force and effect at the time the contract was made, there is no impairment, because existing statutes are read into future contracts and enter into the contract terms by implication." *Gretsch v. Vantium Cap., Inc.*, 846 N.W.2d 424, 435 (Minn. 2014). Both before the district court and on appeal, father has failed to identify legislation that retroactively impairs any specific and existing contracts relating to his management of the child's educational and medical needs. But even assuming father had done so, "the federal constitutional prohibition against contract impairment, U.S. Const., art. I, § 10, cl. 1, has been construed to mean that the state reserves some power to modify contract terms when the public interest requires." *Hertz Corp. v. State Farm Mut. Ins.*, 573 N.W.2d 686, 689 (Minn. 1998) (quotation omitted). Thus, "[t]he

24

"[T]he principle of freedom of contract" is "considered implicit in the guaranty of due process of law in the Fourteenth Amendment to the federal, and art. 1, § 7, of the state, constitution." *McElhone v. Geror*, 292 N.W. 414, 416 (Minn. 1940). But "[n]either under the due process guaranty nor otherwise is the right to freedom of contract absolute." *Id.* Instead, "[a]s with most other individual rights, it is qualified and limited by similar rights of others and those of government." *Id.* Thus, the Minnesota Supreme Court has explained that "[i]ndividual liberty must yield to the conflicting interest of society, acting through sovereign government[,]" and "[i]ndividual will must give way to that of government when the latter is expressed in declared policy, enforced by constitutional means." *Id.*

"To challenge successfully an interference with the liberty of contract protected by the state and federal due process clauses, one must demonstrate that the action is not rationally related to the achievement of a legitimate governmental purpose." *Metro. Sports Facilities Comm'n v. Gen. Mills, Inc.*, 470 N.W.2d 118, 125 (Minn. 1991); *see also State by Humphrey v. Ri-Mel, Inc.*, 417 N.W.2d 102, 106 (Minn. App. 1987) (observing that, "in *Essling v. Markman*, 335 N.W.2d 237 (Minn. 1983)[,] the supreme court explained that freedom of contract has not been recognized as a fundamental right sufficient to invoke strict judicial scrutiny, and thus minimum judicial scrutiny is appropriate"), *rev. denied*

---

legislature . . . can alter contract terms by enacting statutes as long as the legislation is necessary to meet a broad and pressing social or economic need, if the legislation is reasonably adopted for the solution of the problem involved, and if it is not over broad or over harsh." *Id.* (quotation omitted). We note that "[t]he government . . . has a compelling interest in identifying and protecting abused children . . . and in safeguarding the physical and psychological well-being of children . . . ." *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 134 (Minn. 2014) (quotations omitted).

25

(Minn. Feb. 17, 1988). "Under the 'rational[] basis' test an Act should be upheld as constitutional if the record shows the Act is rationally related to achievement of a legitimate government purpose." *Ri-Mel*, 417 N.W.2d at 106 (citing *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981); *Guilliams v. Comm'r of Revenue*, 299 N.W.2d 138, 142 (Minn. 1980)). "There is a presumption in favor of the constitutionality of legislation and a party challenging constitutionality has the burden of demonstrating beyond a reasonable doubt a statute violates a provision of the constitution." *Id.* (citing *McGuire v. C & L Rest., Inc.*, 346 N.W.2d 605, 611 (Minn. 1984)).

> The purpose of the laws relating to permanency . . . is to ensure that:
>
> (1) when required and appropriate, reasonable efforts have been made by the social services agency to reunite the child with the child's parents in a home that is safe and permanent; [and]
>
> (2) if placement with the parents is not reasonably foreseeable, to secure for the child a safe and permanent placement according to the requirements of section 260C.212, subdivision 2, preferably with a relative through . . . a transfer of permanent legal and physical custody . . . [.]
>
> . . . .
>
> The paramount consideration in all proceedings for permanent placement of the child under sections 260C.503 to 260C.521 . . . is the best interests of the child. . . .

Minn. Stat. § 260C.001, subd. 3; *see also R.D.L.*, 853 N.W.2d at 134 (explaining the state's compelling interest in protecting children).

We conclude that the district court did not violate father's substantive due-process rights to freedom of contract by issuing the transfer-of-custody order under the juvenile-

26

protection provisions of the Juvenile Court Act, which include the laws relating to permanency. *See* Minn. Stat. § 260C.001, subds. 1(a), 3 (2022). The statutory prerequisites for the order transferring permanent legal and physical custody of the child under Minnesota Statutes section 260C.517 are rationally related to achievement of a legitimate governmental purpose—the protection of a child adjudicated to be in need of protection or services, and the safeguarding of that child's physical and psychological well-being. *See R.D.L.*, 853 N.W.2d at 134; *see also* Minn. Stat. § 260C.001, subd. 3.

Section 260C.517 requires that the agency prove the following by clear and convincing evidence: (1) that the transfer-of-custody order serves the child's best interests; (2) that the agency made reasonable efforts to reunify the child with father; (3) that father failed to make efforts to use services to correct the conditions that led to the out-of-home placement despite his ability to do so; and (4) that the conditions that led to the out-of-home placement had not been corrected so that the child could safely return home. *See J.C.L.*, 958 N.W.2d at 655-56. We are therefore satisfied that the statute is rationally related to a legitimate state purpose. *See Essling*, 335 N.W.2d at 239.

Strict scrutiny is a higher, more exacting standard of review than the rational-basis test that applies to father's freedom-of-contract argument. *See Ri-Mel*, 417 N.W.2d at 106; *see also Fletcher Props., Inc. v. City of Minneapolis*, 947 N.W.2d 1, 10 n.5 (Minn. 2020) (discussing the application of the "higher hurdle" of strict scrutiny "[w]hen fundamental rights are at stake" and explaining that, if "no fundamental rights are at stake[,] . . . the less demanding rational basis standard applies"). We consider it persuasive that the Minnesota Supreme Court has held that other provisions of the Juvenile Court Act survive the more

restrictive strict-scrutiny test. *See, e.g., R.D.L.*, 853 N.W.2d at 133-38 (holding that Minnesota Statutes section 260C.301, subdivision 1(b)(4) (2012), which provides that parents who previously have had their parental rights to children involuntarily terminated are presumed to be palpably unfit to parent other children, is narrowly tailored to serve the state's compelling interest in protecting children and therefore survives strict scrutiny); *SooHoo v. Johnson*, 731 N.W.2d 815, 821-24 (Minn. 2007) (holding that Minnesota Statutes section 257C.08, subdivision 4 (2006), which allowed district courts to grant reasonable visitation to a person with whom the child has resided for at least two years, survives strict scrutiny because it is narrowly drawn to the state's compelling interest in protecting the general welfare of children by preserving the relationships of recognized family units).

Lastly, although father seems to argue that his due-process rights to freedom of contract entitle him to decline to participate in the court-ordered case plan altogether, the Minnesota Supreme Court has held that, "once a case plan has been approved by the court, the appropriate action for a parent who believes some aspect of the case plan to be unreasonable is to ask the court to change it, rather than to simply ignore it." *S.E.P.*, 744 N.W.2d at 388.

We therefore hold that an order transferring permanent legal and physical custody of a child under Minnesota Statutes section 260C.517 does not violate a parent's substantive due-process rights to freedom of contract.[7]

---

[7] We acknowledge that "'the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and

**DECISION**

The district court did not abuse its discretion in its transfer-of-custody order. The order did not violate father's procedural due-process rights, and an order transferring permanent legal and physical custody of a child under Minnesota Statutes section 260C.517 does not violate a parent's substantive due-process rights to freedom of contract.

**Affirmed.**

---

control of their children.'" *In re Child of M.E.P.*, 4 N.W.3d 152, 162 (Minn. App. 2024) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)), *rev. denied* (Minn. Apr. 25, 2024); *see also SooHoo*, 731 N.W.2d at 820 ("A parent's right to make decisions concerning the care, custody, and control of his or her children is a protected fundamental right."). Although father alludes to his fundamental right as a parent by asserting that "the public safety and police powers of the government have no place interfering in a parent's reasonable and prudent choices in raising his child," he cites no authority in support of this contention. When an appellant "fails to provide legal argument or to cite legal authority in support of [a] proposition[,] . . . [t]he issue is not adequately briefed, and we therefore deem it waived." *In re Welfare of the Child of D.L.D.*, 771 N.W.2d 538, 545 n.2 (Minn. App. 2009). Although we do not reach the issue, we are mindful that the Minnesota Supreme Court has explained that the fundamental right of parents "is not absolute[,]" observing that "[t]he Supreme Court has long recognized that states may intrude on parental rights in order to protect the 'general interest in the youth's well being.'" *SooHoo*, 731 N.W.2d at 822 (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)). Indeed, in construing *Troxel*, the Minnesota Supreme Court has said that the Supreme Court "recognized that there may be instances when the state may constitutionally intrude upon a fit parent's right to the care, custody, and control of the parent's child . . . ." *Id.* at 821.